UNPUBLISHED

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                                     No. 98-4425

JOHNNY LEE WESLEY,
Defendant-Appellant.

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                                     No. 98-4426

TERRENCE RENARD RUSSELL,
Defendant-Appellant.

Appeals from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Henry C. Morgan, Jr., District Judge.
(CR-97-382)

Submitted: June 29, 1999

Decided: July 19, 1999

Before ERVIN, HAMILTON, and MICHAEL,
Circuit Judges.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

Marcia G. Shein, LAW OFFICE OF MARCIA G. SHEIN, P.C., Atlanta, Georgia; Dana W. Johnson, MCLEMORE & JOHNSON, P.C., Silver Spring, Maryland, for Appellants. Helen F. Fahey, United States Attorney, James L. Trump, Assistant United States Attorney, Thomas G. Connolly, Assistant United States Attorney, Alexandria, Virginia, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Johnny Lee Wesley and Terrence Renard Russell appeal their convictions for conspiracy to distribute cocaine, marijuana, and crack cocaine (in violation of 21 U.S.C. § 846 (1994)); for murder in the furtherance of a drug trafficking offense (21 U.S.C.§ 848(e)(1)(A) (1994) and 18 U.S.C. § 2 (1994)); and for interstate transportation in aid of racketeering (18 U.S.C. §§ 1952 and 2 (1994)). We affirm.

I.

The story of the crimes of which Wesley and Russell stand convicted actually revolves around two other men, Colin Rose and Raymond Mills. From 1987 until 1992, Mills had sold cocaine supplied to him by Rose. Rose was in prison from 1993 until 1995, but, upon release, he got back in touch with Mills, and soon the two were in the drug business again. At first, they sold marijuana that they obtained from a source in California. They recruited several accomplices, including Defendant Russell. The primary distribution point for the marijuana was the Rose Park apartment complex in Prince George's County, Maryland.

2

In early 1996, Rose found a source for cocaine in Jamaica. Over the course of the conspiracy, eight different couriers traveled to Jamaica to pick up the drug. The powder cocaine was converted to crack cocaine in one of the Rose Park apartments and was sold in the local neighborhood. About a kilogram of crack cocaine per week was distributed in this fashion.

During the following summer, Russell was a very active participant in the enterprise. He helped cook, cut, package, and distribute the cocaine for Rose. Rose went to Florida for a while, but he still sent Russell 125 to 150 grams of crack cocaine per week through the mail.

Meanwhile, relations between Mills and Rose had soured. Rumors were afloat that Rose was a "snitch," and Rose believed that Mills was the source. Nevertheless, Rose put business first. In December 1996, he and his supplier met with Mills at Mills' apartment in Arlington, Virginia. They cooked up a kilogram of crack cocaine, and they gave it to Mills to sell. Mills was to pay $22,000 for the kilogram; he paid $9,000 up front.

But Rose remained upset with Mills. In late December, Rose told Russell that he wanted someone to beat up Mills. Russell replied that he had a friend who would do the job. That friend was Defendant Wesley.

A few days later, Rose, Russell, and Wesley met at Russell's apartment. Rose asked Wesley to beat up Mills, and Wesley agreed. Rose told Wesley that he could rob Mills as well, and he could expect to get money, jewelry, and guns. Before Wesley left, Russell gave him a quarter-ounce of cocaine.

The trio met to finish their plans on January 7, 1997, and Wesley reported that his cousin would help him beat up and rob Mills. The next day, Rose and Russell met at a nightclub in Washington, D.C. They paged Wesley, he met them, and they drove to Mills' apartment building in Arlington, Virginia, in Wesley's car, a white Lincoln. Rose showed Wesley how to sneak into the building's parking garage and where to expect Mills to park his car. Wesley showed Rose a nine-millimeter pistol, and he said he would use it to confront Mills

3

in the garage's elevator and force him into his apartment. Wesley then drove Rose and Russell back to the capital city and dropped them off.

In the early hours of the next day, just as they had planned, Wesley and his cousin confronted Mills in the elevator. The plan went awry quickly, because Mills did not go meekly into his apartment. Instead, he fought with his assailants in the elevator and outside the apartment, holding on to a railing in a vain attempt to avoid going inside. After dragging Mills into the apartment, Wesley and his cousin tied Mills up with gray duct tape. Mills' head, face, neck, hands, and feet were bound. The several layers of tape around his neck were twisted rope-like and were applied so tightly that Mills died of ligature strangulation.

Wesley and his accomplice ransacked the apartment. They stole many of Mills' belongings, including crack cocaine, clothes, a gun, jewelry, a cellular phone, a video cassette recorder, and even video games. In a hasty exit from the parking garage, Wesley's car struck a post. This event was witnessed by one of Mills' girlfriends, and it was just the beginning of a long trail of evidence Wesley left of his crime.

The next morning, Rose and Russell went to a small motel in Maryland, where they met Wesley and his cousin. When they entered the motel room, Rose saw and recognized the many items stolen from Mills' apartment. Wesley's cousin told them that Mills was dead, and Wesley then detailed the night's events. Wesley gave Russell an ounce of crack cocaine, and Russell and Rose left, with Rose noticing the damage to Wesley's car.

That very afternoon, Wesley and another person pawned some jewelry, a VCR, and a video game system at a Maryland pawn shop. Wesley signed the receipt for the items. A surveillance camera recorded the transaction on tape, and the pawnbroker noticed that Wesley was walking with a limp. Mills' fingerprints were later found on some of the video games Wesley pawned, and two gold charms were identified as his by a friend and by photographs of Mills wearing them.

Shonte Holley, a friend of Wesley, saw him on the evening of January 9. She noticed that he was limping badly, and she recalled that

4

he had not been limping the day before. Over the next few days, she also saw Wesley with money, nice clothing, a new watch and gun, and jewelry.

Soon Rose learned that Wesley was using Mills' stolen cellular phone, which angered him, inasmuch as telephone records of that use would provide clues for police. He told Russell that Wesley should get rid of the phone. Russell also learned that Wesley was selling large amounts of stolen crack cocaine, which angered Russell because Wesley had given him only an ounce.

On January 24, 1997, Wesley was approached by police on suspicion of shoplifting, and he consented to a search of his car. The police found a loaded semiautomatic pistol, later identified as identical to one owned by Mills; 100 grams of crack cocaine; several compact discs, upon one of which were Mills' fingerprints; cellular phones; pagers; a digital scale; and some marijuana.

When the trail of evidence led to him, Rose decided to cooperate with the government. In a second superseding indictment dated December 18, 1997, Russell and Wesley were charged with conspiracy to distribute crack cocaine, powder cocaine, and marijuana; murder in furtherance of drug trafficking; and interstate transportation in aid of racketeering. After a five-day jury trial, they were convicted of those charges. In addition, Wesley was charged with possession with intent to distribute crack cocaine and use of a firearm during and in connection with a drug trafficking offense. The possession charge resulted in an acquittal, and the firearm count was dismissed on the government's motion. Each Defendant was sentenced to three concurrent life sentences, and they now appeal.

II.

Wesley asserts that the evidence was insufficient to sustain his convictions. In the face of such a challenge, a jury verdict must be upheld "if there is substantial evidence, taking the view most favorable to the Government, to support it." Glasser v. United States, 315 U.S. 60, 80 (1942). Substantial evidence is evidence "that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion

5

of a defendant's guilt beyond a reasonable doubt." <u>United States v. Burgos</u>, 94 F.3d 849, 862 (4th Cir. 1996) (en banc).

A conspiracy can be loosely knit; it need not have a rigid structure, and its members need not be bound to it by a blood oath. <u>See id.</u> at 858. Though the evidence must prove the existence of the conspiracy and the defendant's connection to it beyond a reasonable doubt, the connection itself may be a slight one. <u>See id.</u> at 861. A person may be convicted of conspiracy even if he does not know all of his coconspirators or the entire breadth of the criminal undertaking. <u>See id.</u> at 858. Finally, a conspiracy may have a division of labor. One may be a member of a drug trafficking conspiracy without actually handling drugs. "In addition to selling narcotics, . . . participation may assume a myriad of other forms, such as supplying firearms or purchasing money orders for coconspirators or permitting them to store narcotics and other contraband in one's home." <u>Id.</u> at 859.

The evidence that Rose, Russell, and Wesley agreed that Wesley should beat up Mills was more than sufficient to satisfy the test of <u>Glasser</u> and <u>Burgos</u>, but Wesley contends that the conspiracy proved was a different one than the drug trafficking conspiracy charged.*

We think that a rational factfinder could surely conclude otherwise. A witness testified that Wesley regularly had large quantities of crack cocaine, packaged in small baggies, in his possession. Rose testified that he witnessed Russell supplying Wesley with crack cocaine and that Russell told him Wesley distributed cocaine for him in and about Arlington. It is true that Rose was not familiar with Wesley before the plot to beat up Mills was hatched, but, as we noted in <u>Burgos</u>, it is not essential that every conspirator know every other conspirator.

Furthermore, his distribution of the conspiracy's product notwithstanding, Wesley performed a classic conspiratorial role when he agreed to act as "muscle" for Rose and Russell. Rose felt that the con-
_____

*Wesley did not request an instruction on multiple conspiracies at trial, and, largely for the reasons we find the evidence sufficient to sustain his convictions, we hold that it was not plain error to omit such an instruction.

6

spiracy was threatened by Mills, and Wesley agreed to squelch the threat.

In short, there was substantial evidence supporting Wesley's conviction of conspiracy.

Wesley's challenge to his other two convictions largely rests on the premise that he was not a member of the conspiracy. In addition, however, he asserts that there was insufficient evidence that he intended to kill Mills. In this regard, he speculates that the rolled-up, rope-like piece of duct tape with which Mills was strangled got that way through Mills' own efforts to free himself of it. He cites the testimony of the medical examiner, who stated that this theory was "a possibility."

The jury was free to consider this "possibility," and we expect that it did. Surely it was rational, however, for the jury to conclude beyond a reasonable doubt that the duct-tape "rope" was fashioned by Mills' assailants and that, in any event, the killing was intentional.

Wesley's convictions are affirmed.

III.

Russell does not challenge the sufficiency of the evidence. Rather, he asserts that materially exculpatory evidence was withheld from him, in violation of the rule of Brady v. Maryland, 373 U.S. 83 (1963), and that the prosecution knowingly sponsored the perjured testimony of Rose. Though the facts cited in support of these claims were then known to Russell, neither argument was raised at trial; consequently, our review is for plain error. United States v. Olano, 507 U.S. 725, 731-32 (1993).

The Brady claim fails for a fundamental reason: the "exculpatory" information cited by Russell was not withheld by the government. The government's file was open. During cross-examination of Rose, Russell's counsel managed to create an ambiguity as to when and how Rose learned of Mills' death. On redirect, the timing was cleared up: Rose and Russell had been told by Wesley and his cousin that

7

Mills was dead on the morning of January 9. Later that evening, a person identified as "Buddy" called Rose to tell him that Mills had been killed. Rose testified that Buddy's telephone call made him certain of Mills' death; up to that point, he "wasn't quite sure." This ephemeral ambiguity, of the sort that arises numerous times at any trial, was not "withheld" from Russell. Accordingly, it cannot constitute a due process violation under Brady.

Russell also asserts that the government knowingly used Rose's perjured testimony to secure his conviction. This argument is specious. According to Russell, when Rose pled guilty to charges arising from the conspiracy, he signed a statement of facts that stated, "Rose discussed with . . . Terrence Russell . . . Johnny Lee Wesley and others robbing . . . Mills. Rose told them that they should `rough' up Mills during the robbery. Rose did not direct, suggest, or encourage them to kill Mills." Russell interprets this statement as an assertion that he personally participated in the killing. Because Rose testified at trial only that Russell recruited Wesley for the job and participated in the planning of Mills' robbery, the argument continues, that testimony must be perjurious. This argument is an odd one for Russell to make, inasmuch as the alleged "perjury" benefitted him, if marginally, by lessening his role in Mills' murder. In any event, we are certain that there is no plain error here. The alleged inconsistency was throughly explored at trial. Rose stuck to his trial testimony. The jury weighed the evidence and found Russell guilty.

The judgments of the district court are affirmed. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before the court and argument would not aid the decisional process.

AFFIRMED

8